BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiff
MEDITERRANEAN SHIPPING
COMPANY S.A.
355 Lexington Avenue
New York, New York 10017
212-983-8500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DEVAL DENIZCILIK VE TICARET A.S.,

                                                  07 Civ. 8662 (RJS)

                 Plaintiff,
                                      **ATTORNEY AFFIDAVIT AND**
    -against-                            **REQUEST FOR JUDGMENT BY**
                                        **<u>DEFAULT</u>**

MISRIEEN CONSTRUCTION MATERIALS
(a/k/a MISRIEEN CONSTRUCTION OF
CAIRO); MISRIEEN CONSTRUCTION
MATERIALS & TRADING COMPANY (a/k/a
MISRIEEN CONSTRUCTION MATERIALS &
TRADE COMPANY) (a/k/a MASRIEEN
CONSTRUCTION MATERIALS AND TRADE
CO); EL-MASSREYEEN CO. FOR BUILDING
MATERIALS & TRADE (a/k/a EL-
MASSREYIN CO. FOR BUILDING
MATERIALS & TRADE),

                     Defendants.
-------------------------------------------------------X

STATE OF NEW YORK    )
                        )  ss.:
COUNTY OF NEW YORK  )

       Peter Skoufalos, being duly sworn, deposes and says:

    1.     I am a member of this Bar of this Court and am associated with the firm of Brown

Gavalas & Fromm LLP, attorneys for plaintiff in the above-entitled action.  I am fully familiar

with all the facts and circumstances in this action.

2.    I make this affidavit pursuant to Supplemental Admiralty Rule B(2)(b) of the Fed. R. Civ. P., in support of plaintiff's application for the entry of default judgment against defendants.

3.    This is an action to recover One Hundred Fifty Seven Thousand Three Hundred Eighty dollars and Forty cents ($157,380.40) owed by defendants to plaintiff in satisfaction of a final arbitration award entered in London on April 18, 2002.

4.    Jurisdiction over the subject matter of this action is based on federal question jurisdiction.

5.    The defendants, foreign corporations or other entities existing at law, were mailed the Summons, Complaint, and Process of Maritime Attachment by the Clerk of the Court of the Southern District of New York via Federal Express courier on April 22, 2008 pursuant to Supp. Admiralty R. B(2)(b).  True and correct copies of the Clerk's Certificates of Mailing of Summons & Verified Complaint with Ex Parte Order for Process of Maritime Attachment, dated April 22, 2008, are attached hereto as Exhibit A.

6.    Attached hereto as Exhibit B is a true and correct copy of the delivery tracking/confirmation printout from the courier's website, www.fedex.com, showing delivery to Defendants on April 29, 2008.

7.    The defendants have not answered the Complaint and the time for the defendants to answer the Complaint has expired.

8.    The defendants have not entered a special or general appearance in order to challenge process of maritime attachment and garnishment issued against the defendants' property.

9.      This action seeks judgment for the liquidated amount of $157,380.40. The basis for this sum is as follows: Principal amount of $31,750.00, plus interest from November 1, 1996 through October 5, 2007; Costs of final arbitration award of $7,662.24, plus interest from April 18, 2002 through October 5, 2007; Owners' recoverable costs of $44,605.10, plus interest from April 18 through October 5, 2007; Cost of award on costs of $1,806.12, plus interest from June 31, 2002 through October 5, 2007; and costs of enforcement of final arbitration awards of $11,000.00.

9.      An inquest is unnecessary in this matter because the amount demanded by plaintiff was determined in arbitration proceedings in London. Copies of the Final Arbitration Award and Final Award as to Costs are attached hereto as Exhibit C.

10.     The party against whom default is sought is not an infant, in the military, or an incompetent person.

WHEREFORE, plaintiff requests the entry of Default and the entry of the annexed Judgment against defendants.


Dated: New York New York
       May 19, 2008


                                        _____
                                        Peter Skoufalos


Sworn before me this
19th day of May, 2008.


_____
Notary Public

                              **EVAN B. RUDNICKI**
                        **Notary** Public of the State of New York
                                 No. 02RU6142314
                            **Qualified** in Rockland County
                            Term Expires March 13, 2010

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEVAL DENIZCILIK VE TICARET A.S.
                        Plaintiff,

                -V-

MISRIEEN CONSTRUCTION MATERIALS, et al.

                        Defendants.

**CERTIFICATE OF MAILING**

07 CV 8662 (RJS)

I, J. Michael McMahon, Clerk of Court for the Southern District of New York, do hereby certify that on the

**22ND day of April, 2008**

I served the

Summons & Verified Complaint With Ex Parte Order For Process Of Maritime Attachment

pursuant to the Federal Rule of Civil Procedure 4 (f) (2) (c) (ii) filed and issued herein on the,

**5th day of October, 2007**

by mailing via Federal Express, in the Federal Express mail drop box located at 500 Pearl Street, NY, NY, a copy of each thereof, securely enclosed in a Federal Express envelope with a prepaid international airbill addressed to:

See attached for listing of Defendants

Federal Express International Air Waybill Tracking Number:

**8614 8774 9441**

CLERK

Dated: New York, NY

BROWN GAVALAS & FROMM LLP

355 LEXINGTON AVENUE
NEW YORK, NEW YORK 10017

TEL: (212) 983-8500
FAX: (212) 983-5946
www.browngavalas.com
bgmail@browngavalas.com

NEW JERSEY OFFICE

1116 CLIFTON AVENUE
CLIFTON, NJ 07013
TEL: (973) 779-1116
FAX: (973) 779-0738

HARRY A. GAVALAS
(1978-1999)
ROBERT J. SEMINARA
(1987-1999)

April 21, 2008

**BY HAND**



FedEx International Air Waybill

[Handwritten FedEx waybill form]

From: Date 4/21/08  Sender's FedEx Account Number 2409-5949-6
Sender's Name: Peter Skoufalos  Phone (212) 983-8500
Company: Brown Gavalas & Fromm LLP
Address: 355 Lexington Avenue 4th Fl
City: New York  State/Province: New York
Country:  ZIP/Postal Code: 10017

To:
Recipient's Name:
Company: Misr Con Construction Materials + Trade Co
Address: 11 El Sadd El Aaly Street
Address: El Dokki District
City: Giza  State/Province:
Country: Egypt  ZIP/Postal Code:

Your Internal Billing Reference: 1564.003

FedEx Tracking Number: 8614 8774 9441

For Completion Instructions, see back of fifth page.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILED
APR 22 2008
S.D. OF N.Y.

| | |
|---|---|
| DEVAL DENIZCILIK VE TICARET A.S.<br>Plaintiff,<br><br><br>-v-<br><br>MISRIEEN CONSTRUCTION MATERIALS, et al.<br>Defendants. | **CERTIFICATE OF MAILING**<br><br><br><br><br><br>07 CV 8662 (RJS) |

I, J. Michael McMahon, Clerk of Court for the Southern District of New York, do hereby certify that on the

**22ND day of April, 2008**

I served the

Summons & Verified Complaint With Ex Parte Order For Process Of Maritime Attachment

pursuant to the Federal Rule of Civil Procedure 4 (f) (2) (c) (ii) filed and issued herein on the,

**5th day of October, 2007**

by mailing via Federal Express, in the Federal Express mail drop box located at 500 Pearl Street, NY, NY, a copy of each thereof, securely enclosed in a Federal Express envelope with a prepaid international airbill addressed to:

See attached for listing of Defendants

Federal Express International Air Waybill Tracking Number:

**8614 8774 9452**

Dated: New York, NY

_J. Michael McMahon_
CLERK

BROWN GAVALAS & FROMM LLP

355 LEXINGTON AVENUE

NEW YORK, NEW YORK 10017

TEL: (212) 983-8500
FAX: (212) 983-5946
www.browngavalas.com
bgmail@browngavalas.com

NEW JERSEY OFFICE

1118 CLIFTON AVENUE
CLIFTON, NJ 07013
TEL: (973) 779-1116
FAX: (973) 779-0739

HARRY A. GAVALAS
(1978-1999)
ROBERT J. SEMINARA
(1967-1999)

April 21, 2008

**BY HAND**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

APR 2 2 2008

S. D. OF N.Y.

| | |
|---|---|
| DEVAL DENIZCILIK VE TICARET A.S. | **CERTIFICATE OF MAILING** |
| Plaintiff, | |
| | |
| -V- | |
| | |
| MISRIEEN CONSTRUCTION MATERIALS, et al. | |
| | |
| Defendants. | |
| | 07 CV 8662 (RJS) |

I, J. Michael McMahon, Clerk of Court for the Southern District of New York, do hereby certify that on the

**22ND day of April, 2008**

I served the

Summons & Verified Complaint With Ex Parte Order For Process Of Maritime Attachment

pursuant to the Federal Rule of Civil Procedure 4 (f) (2) (c) (ii) filed and issued herein on the,

**5th day of October, 2007**

by mailing via Federal Express, in the Federal Express mail drop box located at 500 Pearl Street, NY, NY, a copy of each thereof, securely enclosed in a Federal Express envelope with a prepaid international airbill addressed to:

See attached for listing of Defendants

Federal Express International Air Waybill Tracking Number:

**8614 8774 9463**

Dated: New York, NY

CLERK

BROWN GAVALAS & FROMM LLP

355 LEXINGTON AVENUE
NEW YORK, NEW YORK 10017

TEL: (212) 983-8500
FAX: (212) 983-5946
www.browngavalas.com
bgmail@browngavalas.com

NEW JERSEY OFFICE

1118 CLIFTON AVENUE
CLIFTON, NJ 07013
TEL: (973) 779-1116
FAX: (973) 779-0739

HARRY A. GAVALAS
(1978-1999)
ROBERT J. SEMINARA
(1987-1999)

April 21, 2008

BY HAND

# EXHIBIT B

**FedEx** ®

Español | Customer Support | FedEx Locations    Search [ ]  [Go]

| Package/Envelope | Freight | Expedited | Office/Print Services ✳ |

Ship ▸    Track ▸    Manage ▸    Business Solutions ▸

Track Shipments/FedEx Kinko's Orders
## Summary Results

🖶 Printable Version   ❓ Quick Help

**Single piece shipments**

| Tracking number | Status | Date/Time | Destination | Service | Signature Proof | |
|---|---|---|---|---|---|---|
| | | | | | Image | View |
| 861487749463 | Delivered | Apr 29, 2008 10:35 AM | GIZA EG | FedEx Express | No | ☐ |
| 861487749441 | Delivered | Apr 29, 2008 10:35 AM | GIZA EG | FedEx Express | No | ☐ |
| 861487749452 | Delivered | Apr 29, 2008 10:35 AM | GIZA EG | FedEx Express | No | ☐ |

**Account number** [ ]
(Required for detailed Signature Proof of Delivery only)
Click here if you have more than one account number for these shipments.

[ View signature proof results ]    [ E-mail signature proof results ]    [ Track more shipments/orders ]

Global Home | FedEx Mobile | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Privacy Policy | Site Map
This site is protected by copyright and trademark laws under US and International law. All rights reserved. © 1995-2008 FedEx

# EXHIBIT C

# m.v. "SERRA DEVAL"

## Charterparty dated 27th August 1996

# FINAL ARBITRATION AWARD

<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>

<u>AND</u>

<u>IN THE MATTER OF AN ARBITRATION</u>

<u>BETWEEN</u>

<u>DEVAL DENIZCILIK Ve TICARET S.A.</u>          **Claimants**
of Istanbul                                    **(Owners)**

<u>AND</u>

<u>MISRIEEN CONSTRUCTION MATERIALS</u>          **Respondents**
of Cairo                                       **(Charterers)**

<u>m.v. "SERRA DEVAL"</u>

<u>Charterparty 27th August 1996</u>

FINAL ARBITRATION AWARD

<u>WHEREAS:</u>

1.      By a Voyage Charterparty on an "Gencon" form, with amendments, concluded and dated 27th August 1996, the Claimants (hereinafter referred to as the "Owners") chartered their vessel, m.v. "Serra Deval" to the Respondents (hereinafter referred to as the "Charterers") for 6 consecutive voyages to carry about 16,000 metric tonnes, 5% more or less in Owners' option, bulk cement

(maximum cargo 16,500 metric tonnes) from 1 good safe berth, always afloat always accessible, Constantza or Agigea, in Charterers' option, to discharge on each occasion at 1 good safe berth, always afloat always accessible, Alexandria, Egypt, on the terms and conditions more particularised therein.

2.    Clause 29 of the Charterparty provided, that should disputes arise, the same should be referred to arbitration in London in accordance with English Law, as more particularised therein.

3.    Disputes having arisen, more particularised below, the parties, by consent, appointed the undersigned William Robertson of 47 Perrymount Road, Haywards Heath, West Sussex, RH16 3BN, as Sole Arbitrator in the reference and I confirmed my acceptance to the parties on 7th August 1997.

I am a full member of the London Maritime Arbitrators Association and of the Baltic Exchange in London.

4.    The seat of the arbitration is London, England.

5.    The disputes referred to the undersigned were in respect of claims by the Owners for outstanding demurrage of US $30,250.00 and the costs of drilling holes in vessel's hatch covers in a sum of US $3,000, together with interest and costs.

The Charterers denied liability and counterclaimed damages as a result of the Owners / Master presenting a vessel unsuitable to load cement at Constantza in a sum of US $37,500.00, together with interest and costs.

6.    I received written submissions and documentation from London solicitors representing both the Owners and the Charterers, who were content that I proceed to an Award on the basis of the written submissions alone, without an oral attended hearing. Neither of the parties requested a reasoned Award.

**NOW I,** the said William Robertson, having taken upon myself the burden of this reference in relation to the disputes between the parties and having read the written submissions and documents produced to me and having weighed and considered the facts and the evidence, **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL ARBITRATION AWARD** as follows: -

**I FIND AND HOLD** that the Owners' claims in respect of outstanding demurrage and the costs of cutting holes in vessel's hatch covers succeed in a total sum of US $31,750.00.

The Charterers' counterclaims fail in their entirety and are hereby dismissed.

**I AWARD AND ADJUDGE** that the Charterers shall forthwith pay to the Owners the sum of US $31,750.00 (Thirty-One Thousand, Seven Hundred & Fifty United States Dollars) together with interest on the said sum at a commercial rate of 7.5% per annum from 1st November 1996, compounded at three monthly intervals, until the date of payment.

**I FURTHER AWARD AND ADJUDGE** that the Charterers shall bear and pay their own and the Owners' recoverable costs of the reference (the latter to be determined by me if so requested, for which determination I hereby reserve powers and jurisdiction) and that the Charterers shall bear and pay the costs of this my **FINAL AWARD**, which **I HEREBY DETERMINE** in the sum of £3,754.50, inclusive of my fees and interlocutory charges.

**ALWAYS PROVIDED** that should the Owners in the first instance have paid any sum in respect of the cost of this Award, they shall be entitled to

immediate reimbursement from the Charterers of the sum so paid, together with interest thereon at the rate of 6% per annum, compounded at three monthly intervals, from the date of this Award until the date of settlement.

GIVEN under my hand in London                    18th April 2002


WILLIAM ROBERTSON                         WITNESS

# m.v. "SERRA DEVAL"

## Charterparty dated 27th August 1996

# FINAL AWARD AS TO COSTS

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND

## IN THE MATTER OF AN ARBITRATION

## BETWEEN

**DEVAL DENIZCILIK Ve TICARET S.A.**
of Istanbul

**Claimants**
**(Owners)**

## AND

**MISRIEEN CONSTRUCTION MATERIALS**
of Cairo

**Respondents**
**(Charterers)**

## m.v. "SERRA DEVAL"

## Charterparty 27th August 1996

## FINAL AWARD AS TO COSTS

## WHEREAS:

1.    By a Voyage Charterparty on a "Gencon" form, with amendments, concluded and dated 27th August 1996, the Claimants (hereinafter referred to as the "Owners") chartered their vessel, m.v. "Serra Deval" to the Respondents (hereinafter referred to as the "Charterers") for 6 consecutive voyages to carry about 16,000 metric tonnes, 5% more or less in Owners' option, bulk cement

*Page 2*

(maximum cargo 16,500 metric tonnes) from 1 good safe berth, always afloat always accessible, Constantza or Agigea, in Charterers' option, to discharge on each occasion at 1 good safe berth, always afloat always accessible, Alexandria, Egypt, on the terms and conditions more particularised therein.

2.    Clause 29 of the Charterparty provided, that should disputes arise, the same should be referred to arbitration in London in accordance with English Law, as more particularised therein.

3.    Disputes having arisen, more particularised below, for the determination of which the parties, by consent, appointed the undersigned William Robertson then of 47 Perrymount Road, Haywards Heath, West Sussex, RH16 3BN and now of The Atlas Room, 37 Woodpecker Crescent, Burgess Hill, West Sussex, RH15 9XY, as Sole Arbitrator in the reference and I confirmed my acceptance to the parties on 7th August 1997.

4.    The seat of the arbitration is London, England.

5.    The disputes referred to the undersigned were in respect of claims by the Owners for outstanding demurrage of US $30,250.00 and the costs of drilling holes in vessel's hatch covers in a sum of US $3,000, together with interest and costs.

The Charterers denied liability and counterclaimed damages as a result of the Owners / Master presenting a vessel unsuitable to load cement at Constantza in a sum of US $37,500.00, together with interest and costs.

6.    On 19th April 2002 I published a Final Award in which I held that the Owners' claims in respect of outstanding demurrage and the costs of cutting holes in vessel's hatch cover succeeded in a sum of US $31,750.00.

I also awarded the Owners interest on that sum at a commercial rate of 7.5% per annum from 1st November 1996, compounded at three monthly intervals, until the date of payment.

In addition, I awarded the Owners their recoverable costs of the reference and I specifically reserved to myself appropriate powers and jurisdiction to determine the Owners' recoverable costs of the reference if agreement could not be reached between the parties.

7.    It proved impossible for the parties to agree the recoverable costs of the reference.

I received from the Owners, under cover of a facsimile message from their solicitors dated 20th May 2002, a schedule of the costs claimed together with disbursements for determination.

I invited submissions from the Charterers' on the costs schedule but they failed to respond, their London solicitors explaining that they were without instructions.

The London solicitors for the Charterers did request, under cover of a fax of 28th May 2002, a further extension of time within which to present the Charterers' submissions on the costs claimed but again they failed to respond and I advised the parties that I was proceeding to my Award as to Costs for final determination.

8.    In considering the costs submitted to me for determination, I have applied the general principle that the costs must be reasonably and properly incurred as well as taking into consideration the level of costs appropriate to an arbitration of this nature and complexity.

The total sum claimed by the Owners in their schedule of costs amounted to £21,856.50, comprising profit costs and disbursements.

9.    The Owners requested that I take into consideration when exercising my discretion as to the award of costs the conduct of the parties in relation to the case in general and they made the following comments: -

"1.    On 21st February 2001, the Respondents applied to the Tribunal to exercise its powers under s 41(3) Arbitration Act 1996 to strike out the Claimants' case on the basis of inordinate and inexcusable delay. The Respondents' interim application led to a protracted exchange of correspondence between the parties incurring significant legal costs. The Claimants submitted that the Respondents' application was bound to fail from the outset on the basis that the Respondents failed to provide any credible evidence of "serious prejudice" occurring as a result of any delay. The Claimants submit that, in respect of this interim application, the Claimants should be entitled to recover their costs in full.

2.    In the same application, the Respondents requested the Tribunal to exercise its discretion to award the Respondents security for their costs. The quantum of security requested was £54,207.99, which represented a figure the Respondents' expected to incur by way of legal expenditure in defending this reference. In the event, the Respondents' application was refused by the Tribunal on the basis of the Respondents' inconsistent submissions regarding the issue of "documents only". The Claimants submit that additional legal expenses were incurred in dealing with this unnecessary interim application, which the Claimants should be entitled to recover in full.

3.    On 18th July 2001, the Respondents sought leave from the Tribunal to submit "skeleton arguments" in support of each of the parties' respective case. On 20th July 2001, the Claimants protested that the introduction of "skeleton arguments" would significantly increase legal costs incurred in this reference. The Claimants' protests were

*fully justified when the Respondents served "skeleton arguments" which departed quite substantially from their case as previous pleaded, a fact which was acknowledged by the Tribunal in their fax of 14th August 2001. We attach herewith a copy of our fax to Messrs. Baker & McKenzie of 23rd July 2001 marked "without prejudice save as to costs" in which we deal with the issue of "skeleton arguments". We should be grateful if the Tribunal could consider this communication when assessing the Owners' costs.*

4.  *Finally, on 2nd August 2001, the Respondents submitted, by way of late additional voluntary disclosure, a bundle of 43 documents, many of which were not translated. The documents were said to evidence the Respondents' Counterclaim. The Claimants incurred significant legal expense in responding to those documents, which would not have otherwise been incurred had the documents been disclosed in the usual way. The Tribunal is asked to consider the issue of late and incomplete disclosure when exercising its discretion as to costs."*

10.    Bearing in mind the comments made by the Owners as outlined above, I have taken into consideration the initial application of the Charterers to strike out the Owners' claims for want of prosecution, in respect of which the Charterers alleged there had been inordinate and inexcusable delay. It is a fact that this led to a considerable exchange of correspondence between the parties and led to the Charterers' requesting the Tribunal exercise its discretion to award the Charterers security for their costs. Both of these applications were refused.

11.    I took due note of the charging rates applied for a Partner of £275.00 per hour, an Assistant Solicitor at £165.00 per hour and £105.00 for the Trainee.

As no issue has been taken by the Charterers in relation to these charging rates, I have considered the level of charging rates for the Partner, Assistant Solicitor and Trainee to be fair and reasonable, taking into consideration rates charged by London solicitors in a case of this nature during the period under consideration.

12.    I considered fully the chargeable time recorded in the schedule of costs allocated to the Partner and the Assistant Solicitor, as well as to the Trainee Solicitor, and took into consideration the entire correspondence between the parties throughout this reference, including the initial applications to strike out the Owners' claim for want of prosecution and the application made by the Charterers for security for their costs.    Taking into consideration these developments, together with the preparation of the case for arbitration, I can find no fault with the total hours charged by the Owners, particularly bearing in mind that the Partner's involvement was minimal and that there was a fair balance between the involvement of the Assistant Solicitor and the Trainee Solicitor.    So far as the Trainee Solicitor is concerned, it is apparent that a lot of the initial preparation work was done by the Trainee.

13.    In addition, the Owners claimed £700, being some 5 hours work by the Costs Draughtsman at a rate of £140 per hour, which is a reasonable level of charges in the circumstances and I have allowed that claim in full.

14.    In the light of my findings detailed above, I find and approve the Owners' recoverable costs, including the disbursements, which comprise a proportion of the Arbitrator's appointment fee and the fees of the attending consultant, TMC (Marine Consultants) Ltd., in the sum claimed of £21,856.50.

**NOW I,** the said William Robertson, having taken upon myself the burden of Sole Arbitrator in this reference in relation to the disputes between the parties and in relation to the issue of costs, and having given due weight thereto, and having considered the facts and the evidence put before me, **DO HEREBY**

**MAKE, ISSUE AND PUBLISH** this my **FINAL AWARD AS TO COSTS** as follows: -

**I FIND AND HOLD** that the Owners' claim in respect of their recoverable costs of the reference succeeds in the total sum of £21,856.50.

**I AWARD AND ADJUDGE** that the Charterers shall forthwith pay to the Owners the sum of £21,856.50 (Twenty-One Thousand, Eight Hundred & Fifty-Six Pounds Sterling and Fifty Pence) representing the Owners recoverable costs of the reference, together with interest on the said sum at a rate of 6% per annum, compounded at three monthly intervals, from 18th April 2002 until the date of settlement by the Charterers.

**I FURTHER AWARD AND DIRECT** that the Charterers shall bear and pay the Owners' costs of this reference (for the determination of which I hereby reserve powers and jurisdiction) and that the Charterers shall also bear the costs of this my **FINAL AWARD AS TO COSTS**, which **I HEREBY DETERMINE AND SETTLE** in the sum of £885.00, inclusive of my fees and interlocutory charges.

**ALWAYS PROVIDED** that if, in the first instance, the Owners have paid any sum in respect of the cost of this Award, they shall be entitled to immediate reimbursement from the Charterers of the sum so paid, together with interest thereon at the rate of 6% per annum, compounded at three monthly intervals, from the date of payment of such sum by the Owners until the date of settlement.

*Page 8*

**GIVEN** under my hand in London                    26th July 2002


..............................................

**WILLIAM ROBERTSON**

..............................................

**WITNESS**

# m.v. "SERRA DEVAL"

## Charterparty dated 27th August 1996

## REASONS FOR THE ARBITRATOR'S FINAL AWARD

**Note:**

These reasons do not form part of the Award. They are issued after its publication and given on the understanding that no use shall be made of them in any proceedings, which may be taken on or in connection with the Award.

1)      The m.v. "Serra Deval" was fixed by her Owners on a "Gencon" form of Charterparty, with amendments, dated 27th August 1996 for 6 consecutive voyages to carry a cargo of about 16,000 metric tonnes, 5% more or less in Owners' option, bulk cement. The vessel was to perform 6 consecutive voyages and always to ballast after completion of discharge at Alexandria to the loading port for the next cargo. The Charterparty specified that the maximum cargo to be loaded was 16,500 metric tonnes.

        The vessel was to load each cargo at 1 good safe berth, either Constantza or Agigea, for discharge at Alexandria, Egypt.

2)      In these arbitration proceedings, the Owners claimed outstanding demurrage in a sum of US $30,250.00 and the cost of drilling holes in vessel's hatch covers in a sum of US $3,000, together with interest and costs.

        The Charterers denied liability and counterclaimed damages as a result of the Owners / Master presenting a vessel unsuitable to load cement in a sum of US $37,500, together with interest and costs.

3)      The Charterparty provided, inter-alia, as follows:

## Box 18

## Demurrage Rate (Loading and Discharging)

*"US $4,000 - / free despatch (see Box 21)"*

### Clause 6 of Part II

*"(c)  Commencement of Laytime (Loading & Discharging)*

*Laytime for loading and discharging shall commence at 2 p.m. if notice of readiness is given before noon, and at 8 a.m. next working day if notice given during office hours after noon. Notice at loading port to be given to the shippers named in Box 17.  Time actually used before commencement of laytime shall count.  Time lost in waiting for berth to count as loading or discharging time, as the case may be.  W/W/W/W both ends..."*

### Clause 7 of Part II

### Demurrage

*"Demurrage at the rate in Box 18 per day pro rata for any part of a day to be allowed merchants altogether at ports of loading and discharging."*

### Clause 19

*"Cargo to be loaded and trimmed free of risk and expense to the vessel with shippers' loading equipment at the rates of 3,000 mt per weather working day of 24 consec hours or pro rata Sundays and holidays includes.*

*The cargo to be discharges frm vsl directly into mv "Four M" cement terminal which is equipped with Swiertel system. Charterers capable to receive cargo of 3,000 mts per weather working day of 24 consecutive hours or pro rata Fridays and*

*holidays included. Owners to have the right to discharge around the clock.*

## Clause 25

*"Vessel's holds to be clean and dry suitable to load the cement in bulk to shippers' / Charterers' full satisfaction. Inspection shall be available upon vessel's arrival."*

## Clause 31

*"The Charterers shall pay the Owners demurrage at the rate of US $4,000 per day or pro rata for any part of a day which exceeds the allowed laytime at loading and discharging ports. Free despatch both ends."*

4)    The m.v. "Serra Deval" is a self-trimming bulk carrier, having four holds and four hatches of 15,786 metric tonnes dwat, built in 1980 and flying the Turkish flag.

The Owners submitted that, pursuant to the terms of the Charterparty, the vessel arrived at the nominated load port, Constantza, on 8th September 1998 (Sunday) and the Master tendered notice of readiness that day at 1800 hours. They said that, in accordance with Clause 8 of the Charterparty, laytime commenced to count at 1400 hours the following day, 9th September, and that Clause 19 of the Charterparty provided that the allowed laytime was 5 days, 4 hours, calculated on the basis of a rate of loading of 3,000 metric tonnes per weather working day of 24 consecutive hours; the cargo loaded being 15,500 metric tonnes.

The Owners calculated that laytime counted until expiry at 1800 hours, 14th September 1996, when the vessel came on demurrage and demurrage accrued until the completion of loading at 0730 hours, 22nd September 1996. The vessel was on demurrage for a period of 7 days, 13 hours, 30 minutes, which, at the Charterparty demurrage rate of US $4,000 per day, equated to demurrage of US $30,250.00, in respect of which they claimed reimbursement from the Charterers.

In addition, the Owners claimed a sum of US $3,000 in respect of expenses incurred for drilling holes in the vessel's hatch covers, pursuant to a request from the Charterers.

5)      The Charterers alleged that the notice of readiness tendered by the Master was invalid for the reason that the vessel was not in all respects ready and suitable to load cement in bulk to the shippers' / Charterers' full satisfaction, pursuant to Clause 25 of the Charterparty.

The Charterers referred to the fact that the vessel lacked holes in its hatch covers, which were required as a matter of trade custom and practice, both in Constantza and generally for the loading of bulk cement.

They referred to the fact that this issue was raised by the agents, Nedelcu Shipping Agency, in their telex message of 10th September 1996, in which they mentioned that they had been informed by the Master that the vessel had no holes in the hatch covers. They went on to explain that the vessel had to have a minimum of 3 holes to be fitted with flanges and to be ermetically closed after loading.   The Charterers explained that the Owners had commenced working on drilling the holes in the hatch covers on 14th September and the ship gave notice that it had completed this work at 1222 hours, 17th September.   They argued, therefore, that laytime commenced to count on or after that time.   They served in evidence a copy of the notice given by the Owners.

Loading of the vessel commenced at 2130 hours, 18th September and the loading was completed at 0500 hours, 22nd September within the permitted laytime and, therefore, they, as Charterers, were not liable for any demurrage.

With regard to the Owners' claim for the cost of putting holes in the vessel's hatch covers, they submitted that the Charterparty required the Owners to produce a ship suitable to load bulk cement.   The trade custom and practice applicable in the port of Constantza required the vessel to have holes in its hatch covers and, therefore, the drilling of such holes was required to comply with the Owners' obligations under Clause 25 of the Charter and those expenses were for the Owners' account.

The Charterers argued, in the alternative, that, if they were found liable to the Owners for any of the sums claimed, they sought to set off such sums claimed in diminution or extinction by reason of the Owners' breach of Clause 25 of the Charterparty, in having supplied a vessel that was not suitable to load cement in bulk, and further they had suffered loss and damage due to a delay of 5 days.

The Charterers explained that they had arranged to receive a shipment of bulk cement approximately once a week at Alexandria and to sell it at a profit margin of US $3 per metric tonne. The production capacity was approximately 2,500 metric tonnes per day and, due to the late arrival of the "Serra Deval", they had been deprived of any bulk cement to sell during that 5 day period and had suffered loss in a sum of US $37,500, which they claimed from the Owners.

6)      The Owners responded denying that there was any such thing as a trade custom at Constantza and elsewhere and further denied that they had any obligation whatsoever to open holes in the hatch covers.

The Charterers had failed to outline the precise scope of the trade custom they alleged, and these allegations were, in any case, contrary to the terms and conditions of the Charterparty and in particular Clause 30, which provided, inter-alia, as follows:

> *"Vessel's crew to open and close hatches before, during, after loading operations as required by stevedores, free of expense and time to the Charterers."*

The Owners referred to two further clauses in the Charterparty to sustain their argument and they were Clauses 5(b) and 19, as follows:

## Clause 5(b)

> *"The cargo shall be brought into the holds, loaded, stowed and/or trimmed... by the Charterers or their agents free of any risk, liability and expense whatsoever to the Owners."*

<u>Clause 19</u>

*"The cargo to be loaded and trimmed free of risk and expense to the vessel with shippers loading equipment ..."*

The Owners submitted that these express terms were in direct conflict with the implied term, which the Charterers wished to import. If loading was to be carried out by pipes connected to holes in the hatch covers, then obviously it was not necessary to open the hatches during the course of loading and, therefore, as the Charterparty expressly provided for the opening of holds by the crew, there was inconsistency with the terms the Charterers sought to apply.

The Owners maintained, therefore, that they were in no way in breach of Clause 25 of the Charterparty as that clause referred to the readiness of the vessel's holds and provided that they should be dry and suitable to load the cargo, hatch covers not being mentioned at all.

The Owners referred to the Charterers' counterclaim, by way of setoff, for delay and could not understand how the Charterers could do so, if they were liable for demurrage and the expenses claimed. It would follow, therefore, that on the basis that the Charterers were responsible for opening holes in the vessel's hatch covers, the Owners could not be held liable for any delay. In any event, they denied that the vessel was delayed due to the opening of the hatch covers. The agents had informed the Owners prior to arrival that the prospects for berthing were 15th or 16th September because the berthing schedule at berth no. 68 had been changed. The Charterers instructed the Master to make the holes required in the hatch covers on 13th September, which were to be completed the following day. On 15th September, the agents informed the Owners that the vessel was still at the Roads due to bad weather and that the estimated time for berthing was evening 17th September or morning 18th September. On 17th September, the agents informed the Owners that the berthing prospects were 18th September in the afternoon or evening. It is abundantly clear that the vessel was not delayed by the opening of the holes in the hatch covers but by other factors at Constantza at the time.

The Owners served in evidence to support their position in relation to the practice of cutting holes in the vessel's hatch covers for loading cement an expert report of TMC (Marine Consultants) Ltd.

7)    The Charterers clarified that they were only seeking to imply one term into the Charterparty.  There was already an express term that the vessel should have been "*suitable to load cement*" in accordance with Clause 25 and the implied term is that the custom of the trade at Constantza requires holes to be drilled in vessel's hatch covers for loading cement.  The ship was, therefore, not suitable to load cement at Constantza.

The Charterers submitted that it was widely accepted that loading bulk cement is a difficult and polluting process and that without proper loading procedures the cement raises dust clouds, which are damaging to the local environment.  Further, to effect loading through open hatch covers presents a danger that moisture will enter the hold, which would cause the cement to solidify.  Such concerns in Constantza over pollution have developed into a custom and practice of ensuring that bulk cement is loaded through holes in hatch covers.

The Charterers maintained that there were no terms in the Charterparty, which were contrary to the implied term.  They referred to Clause 30 with regard to vessel's crew opening and closing hatch covers before, during and after loading operations but suggested that the Charterparty made a clear distinction between loading operations in Constantza and discharging operations in Alexandria.  At discharge the Siwertel system was to be used, in accordance with Clause 19.  Such a system, of course, requires the opening and closing of hatch covers and this was what was referred to in the Charter.

In support of their various contentions, the Charterers submitted in evidence a witness statement of Kamal Mohamed El Waziry, who is Vice President of Misrieen Construction Material, and also an expert report of Gordon Giles & Co. Ltd.

Finally, the Charterers also provided documentation in support of their counterclaims and submitted further documents by way of correspondence with the shippers regarding the berthing schedule of the vessel at Constantza.

8)      **The Conclusions**

The m.v. "Serra Deval", pursuant to the terms of the Charterparty, arrived at the nominated load port, Constantza, on Sunday 8th September 1996 at 1800 hours, at which time the Master tendered a notice of readiness.

Although what happened next appears to be somewhat unclear, a telex message from the agents, Nedelcu, of 10th September, timed at 1327 hours, was sent to the Owners following, presumably, a discussion with the Master when it was apparent that no holes had been drilled in vessel's hatch covers. This was followed at 1429 hours the same day by a message from the Owners to A1 Team Chartering at Constantza and Nedelcu requesting they make contact with the Charterers / shippers to arrange for the cutting of holes at Charterers' expense. This was responded to by the Charterers' agents, advising that the cost must be for the Owners' account. A further dialogue continued between the Owners and the Charterers in respect of the cost of cutting holes in the hatch covers, which remained in dispute.

A further message of 13th September from the Owners confirmed that instructions had been given to the Master to do the necessary works, which would be completed, they said, by 14th September. A further message from the Owners of 17th September confirmed that the vessel's crew had opened the holes in the hatch covers. In that same message, the Owners enquired as to berthing instructions and commencement of loading and were informed by the agents, Nedelcu that the berthing prospects were for 18th September in the afternoon or evening.

The vessel berthed at berth no. 68 at 1745 hours 18th September and between 1900 hours and 2130 hours an initial draft survey and hold inspection was undertaken, with loading commencing at 2130 hours that day.

9)    The allegations made by the Charterers were that the Master had not tendered a valid notice of readiness on arrival for the very reason that the vessel was not ready to load the cargo of cement in bulk because of the lack of holes in vessel's hatch covers to allow loading operations to take place.

The agreed terms in the Charterparty make it clear at Clause 25 that the vessel's holds are to be clean and dry, suitable to load cement in bulk to shippers' / Charterers' full satisfaction. The clause also makes it clear that an inspection of the holds shall be available on vessel's arrival at the port.

Clause 30 makes provision for the ship's crew to open and close the hatches before, during and after loading operations, as required by the stevedores free of expense and time to the Charterers.

The essence of this dispute is whether the Owners knew or should have known that it was necessary to have holes in vessel's hatch covers to facilitate loading operations, in accordance with customary practices both in the trade and at Constantza.

Let me say at this juncture that there is no evidence before me as to whether the Owners had previous experience of loading cement per se or whether they had any knowledge of the cement industry generally.

It is not clear whether discussions took place at the pre-fixture stage with regard to the requirements of the Charterers to have holes in the hatch covers and neither is this mentioned in the witness statement of Mr. El Waziry.

I can only conclude, therefore, bearing in mind that the Charterparty is silent as to the specific requirements of the Charterers to have holes in the hatch covers for loading at Constantza, that this was not an issue that was discussed between the parties in the lead up to the fixture. It is apparent from the evidence that this matter must have been raised in discussions between the Master and the agent following the arrival of the vessel at Constantza, following which the Owners took appropriate action to have the holes fitted in accordance with the Charterers' requirements.

The Charterers have submitted that there is an implied term in the Charterparty that the custom of the trade at Constantza requires holes to be made in the hatch covers and, as there was not, the vessel was unsuitable to load the cement at Constantza.

They referred to the fact that bulk cement raises dust clouds, which can be damaging to the local environment, and further that if holes are not drilled in the hatch covers there is a danger that moisture would enter the holds and solidify the cargo. They maintained that there were no terms in the Charterparty, which were contrary to the implied term. They mentioned Clause 30, which referred to the vessel's crew opening and closing hatch covers before, during and after loading operations, but said that it was clear that a distinction had been made between loading operations in Constantza and loading operations in Alexandria, where the cargo was to be discharged by use of a Siwertel system. They said a Siwertel system would, of course, require opening and closing of the hatch covers and, therefore, there was not any inconsistency with loading through holes in the hatches at Constantza.

I disagree with that analogy, bearing in mind the terms of the Charterparty.

Firstly, Clause 25 specifies that the ship's "holds" are to be clean and dry, suitable to load cement in bulk, no mention is made of the necessity to have holes in the hatch covers to facilitate that loading operation; it merely mentions the ship's holds. This is followed by Clause 30 of the Charterparty, which is quite precise in that the vessel's crew are to open and close the hatches before, during and after loading operations, as required by the stevedores. Again, there is no mention of loading operations to be conducted through holes in the hatch covers.

The analogy made with discharge as provided in Clauses 19 & 20 is totally separate from what has been said in relation to loading operations in the Charter. Therefore, anyone reading that Charterparty and its specific provisions would be unable to draw a conclusion that the ship was meant to have holes in the hatch covers to facilitate loading operations.

The question remains, was there an implied term in this Charterparty in relation to the custom of the trade at Constantza requiring holes in the hatch covers.

Mr. El Waziry, in his witness statement, has explained his experience at Constantza in relation to the loading of cement in bulk and has clearly recounted the circumstances leading to the holes being fitted into the hatch covers, following the vessel's arrival at Constantza. As I mentioned earlier, Mr. El Waziry has mentioned nothing with regard to whether these matters were brought to the Owners' attention during the fixture negotiations.

Both the respective experts, Gordon Giles & Co. Ltd. for the Charterers and TMC (Marine Consultants) Ltd. for the Owners, expounded their views in relation to the practice of drilling holes in hatch covers both at Constantza and elsewhere. They included in their report the question of trade practice generally as they saw it.

Whilst it is accepted that there is a general understanding in the shipping industry as to how bulk cement cargoes are loaded in certain parts of the world, it cannot be concluded that there was a general understanding by this Owner or any other as to the trade practices in Constantza. The experts have made it clear that whilst loading operations through hatch covers is the customary practice in most parts of the world, there are certain specific areas that do not have that practice. Therefore, an Owner, who may not have had any knowledge with regard to the carriage of cement in bulk and in particular may not have had any knowledge as to trade practices at Constantza, would have been unlikely to raise such issues with the Charterers during fixture negotiations, particularly bearing in mind the fact that the Charterparty clearly makes provision in Clause 30 that the ship's crew are to open and close the hatches before, during and after loading. If the customary practice of having holes in hatch covers was prevalent at the nominated loading port, particularly as such requirements were well within the working knowledge of the Charterers who were obviously experienced in the cement trade, that should have been brought to the Owners' attention during the negotiation and clearly stipulated in the eventual Contract.

Therefore the facts of the matters are that the vessel arrived at Constantza and the Master tendered a valid notice of readiness, concluding that his holds were clean and dry and suitable to load cement in bulk to shippers' / Charterers' full satisfaction. It is noteworthy that Clause 25 provides for an inspection to be available on vessel's arrival. No such inspection took place until several days later, when the vessel was at the berth.

It is clear from the contemporaneous documentation that, following the arrival of the ship, no berth was available to allow the ship in. The statement of facts from the ship's agents clearly records that the vessel was waiting for loading from arrival. Even when it became apparent that the vessel needed holes in the hatch covers, the vessel continued to wait for a berth. Any suggestion of delay is, therefore, clearly attributable to the lack of a berth and there is no evidence to suggest that the delay in berthing was due to the vessel not having holes in her hatch covers. It is interesting to note that there is a shippers' remark on the statement of facts to the effect that from arrival the vessel was not ready for loading due to the lack of holes in the hatch covers. I find that remark somewhat questionable, bearing in mind that there is no evidence that any inspection of the vessel took place on arrival, as provided for in Clause 25 of the Charterparty. The evidence suggests that knowledge of the lack of holes in vessel's hatch covers did not become apparent until 10th September and, quite clearly, the vessel could have berthed, if a berth had been available, from any time following arrival. There is a contemporaneous document from the Charterers, which appears to be dated 2nd September 1996, informing Crescent that the "Serra Deval" would arrive on 12th September and they were anxious to have the vessel berthed immediately on arrival for loading.

It is interesting to read the comments of Mr. El Waziry, who has explained the situation at Constantza, as per Clause 5 of his statement where he states "*for this reason cement cannot simply be poured into a vessel's holds like any other bulk commodity, it either has to be loaded through hermetically sealed holes or, alternatively, by a Siwertel system. However, there was no Siwertel system available at Constantza during 1996*". It is clear from that statement that cargo could have been loaded, either through holes in the hatch covers or by the

*Page 13*

Siwertel system. Surely, therefore, the Owners should have been consulted, either prior, during or shortly after the fixture, to inform them as to the system operated at Constantza.

If we take a close look at the sequence of events in accordance with the contemporaneous documentation, it will be seen that there was a message from the agents to the Owners on 6th September 1996 confirming that the schedule for berth 68 had been changed and the prospects for berthing were 15th / 16th September 1996. A further message on 15th September from the agents reported that the vessel was still waiting at Constantza Roads due to bad weather and that the vessel was giving an expected time for berthing as the evening of 17th September or the morning of 18th September. A further message on 17th September reported that the berthing prospects were now 18th September afternoon / evening.

It is clear that the vessel was not delayed as a consequence of the need to put holes in the hatch covers but because of congestion and bad weather.

10)     In summary, therefore, I have concluded that there is no implied term to be imported into the Charterparty that the custom of the trade at Constantza requires holes in hatch covers. The vessel, on arrival and pursuant to Clause 25 of the Charterparty, was suitable to load the cargo of cement in bulk. Laytime, therefore, commenced to count at Constantza at 1400 hours, 9th September 1996 and continued to accrue until the laytime allowed for loading of 5 days, 4 hours expired at 1800 hours on Saturday 14th September 1996.

Demurrage accrued from that time on until completion of loading at 0730 hours, 22nd September 1996 for a period of 7 days, 13 hours, 30 minutes.

I have concluded, therefore, for the reasons given, that the Owners' claim for outstanding demurrage succeeds in the sum of US $30,250.00.

11)     In the light of my conclusions detailed above, the Owners have not breached the terms of Clause 25 of the Charterparty, as alleged by the Charterers. I have found that the vessel was suitable to load cement in bulk, in accordance

with that Clause, and that the reason for the delay in berthing was not as a consequence of the vessel not having holes cut in the hatch covers but for the reason that the Charterers had been unable to provide a berth for the vessel until 1745 hours, 18th September.

As a consequence, it is not necessary for me to deal in detail with the Charterers' counterclaims, which I have concluded fail and are hereby dismissed.

12)     Finally, the Owners have claimed a sum of US $3,000, being the cost of drilling holes in vessel's hatch covers, pursuant to the requirements of the Charterers.   The Owners submitted that there was no provision in the Charterparty, however, they had agreed to undertake the work at the Charterers' expense.

13)     The Charterparty is silent as to the fitting of holes in vessel's hatch covers and who should pay for them.   Therefore, we have to look elsewhere in the Charterparty for guidance in that respect.   Clause 19 of the Charterparty provides that the cargo is to be loaded and trimmed free of risk and expense to the vessel with shippers' loading equipment.   The freight rate in Box 13 provides that the freight is to be calculated on the in-taken cargo *"free in / out trimmed"*.

I am satisfied, therefore, that Clause 19 is the operative clause to the extent that the cargo is to be loaded by the Charterers / shippers at their risk and expense.   As it was necessary to cut holes in the vessel's hatch covers at Constantza to facilitate the loading operations, then it follows that the cost and indeed risk of that operation must rest with the Charterers themselves.

Although Mr. El Waziry in his witness statement mentioned the agents suggesting that the Owners were to pay for cutting holes in the hatch covers, Mr. El Waziry did not give his own opinion or that of the Charterers on that subject. The experts found difficulty in relating standard practice as to who should pay for opening suitable holes in the hatch covers.

Clearly this is a matter, as I have mentioned previously, that should have been addressed at the pre-fixture stage of negotiations but was not and, for

the reasons given, I have found that Clause 19 applies to make the Charterers responsible for the cost of cutting those holes.

The Owners have claimed a sum of $3,000 in relation to the costs, including Classification Society expenses. Having considered the views of the experts, I have concluded that a sum of $3,000 is somewhat excessive in the circumstances and I have, accordingly, awarded the Owners 50% of the claimed costs, i.e. US $1,500.00.

In summary, therefore, of my findings, the Owners have succeeded in their claims to the extent of US $31,750.00.

14)    The Owners, having been successful, are entitled to interest on the sum of US $31,750.00, which I have awarded, in the exercise of my discretion, at a commercial rate of 7.5% per annum from 1st November 1996, compounded at three monthly rests, until the date of payment.

15)    The Owners are entitled to their costs, which follow the event in the normal manner. I have reserved to myself appropriate power and jurisdiction to determine the Owners' costs if they cannot be agreed between the parties.